# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**GLORIA J. DANIELSON**
**DANIEL A. LADENDORF**
**Ladendorf & Ladendorf**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**JON M. PINNICK**
**Schultz & Pogue, LLP**
Indianapolis, Indiana



FILED

Aug 22 2012, 9:41 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ASHLEY T. TUCKER, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  79A05-1108-CT-404 |
| | ) | |
| MICHELLE R. HARRISON, M.D., | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas H. Busch, Judge
Cause No. 79D02-0705-CT-18

**August 22, 2012**

**OPINION - FOR PUBLICATION**

**ROBB, Chief Judge**

## Case Summary and Issues

Ashley Tucker filed a medical malpractice complaint against Dr. Michelle Harrison, alleging Dr. Harrison's negligence in performing a surgical procedure damaged her ovaries and left her infertile. A jury found in favor of Dr. Harrison and Tucker now appeals, raising three issues for our review: 1) whether the trial court abused its discretion in excluding testimony from one of Tucker's expert witnesses; 2) whether the trial court abused its discretion in denying Tucker the opportunity to question witnesses about possible financial bias; and 3) whether the trial court abused its discretion in refusing to give the jury a res ipsa loquitur instruction. Concluding the trial court did not abuse its discretion in excluding Tucker's expert testimony, limiting her questioning of a witness about possible bias, or in instructing the jury, we affirm.

## Facts and Procedural History

On October 1, 2004, Dr. Harrison, a physician with a specialty in obstetrics and gynecology, performed an exploratory laparoscopic surgery on then-twenty-year-old Tucker to try to determine the cause of Tucker's severe abdominal pain and cramping. Dr. Harrison was specifically looking for endometriosis or adhesions, but had also discussed with Tucker the possibility of finding ovarian cysts. Dr. Harrison and Tucker agreed that if cysts were determined to be the problem, Dr. Harrison would remove them during the procedure. Dr. Harrison did not find any endometriosis or adhesions during the exploratory surgery, but she did find a small cyst on each ovary. As there appeared to be no other cause for Tucker's pain, Dr. Harrison performed a bilateral ovarian cystectomy with monopolar electrocautery

2

scissors, as she had in "hundreds" of other cystectomies. Transcript at 222. Dr. Harrison described nothing unusual during Tucker's surgery, and at a follow-up appointment approximately three weeks later, Tucker reported that she was feeling well and her pain had resolved. Several months later, Tucker learned that her ovaries had failed and she was permanently sterile.

Tucker filed a medical malpractice complaint against Dr. Harrison, alleging that Dr. Harrison was negligent in performing the procedure and caused the ovarian failure. A medical review panel delivered a unanimous decision that Dr. Harrison did not breach the standard of care, and the case moved to the trial court. In May 2010, Tucker sent notice of her intention to serve non-party requests for production on the Indiana Patient's Compensation Fund, the Indiana State Medical Association, and each member of the medical review panel, seeking to uncover evidence of possible financial bias. Dr. Harrison objected and filed a motion to quash. Following a hearing, the trial court granted Dr. Harrison's motion to quash, finding that Tucker would not be allowed to question trial witnesses about financial bias of this nature and therefore the discovery would not lead to admissible evidence.

A multi-day jury trial began on July 18, 2011. Tucker tendered as evidence the videotape deposition of Dr. Michael Freeman, Ph.D., an epidemiologist, regarding the statistical probability that the surgery caused Tucker's injuries. On Harrison's motion, the trial court allowed the deposition to be read into the record, minus the probability testimony. At the conclusion of the testimony, Tucker requested the trial court give a res ipsa loquitur

3

instruction to the jury. Dr. Harrison objected, and the trial court declined to give the instruction. The jury returned a verdict for Dr. Harrison and against Tucker. Tucker now appeals. Additional facts will be provided as necessary.

Discussion and Decision

I. Expert Witness Testimony

Tucker first contends the trial court erred in excluding the probability testimony of her expert witness, Dr. Freeman. Dr. Freeman is a forensic epidemiologist, which he described as "the scientific field that deals with populations of people and the kinds of injuries or diseases they get and what causes those injuries and diseases [. . .] doing statistical analysis of what you find in the populations in order to draw conclusions that are reliable." Tr. at 149. Dr. Freeman has a Ph.D. in public health and some medical training, although he is not a medical doctor. Dr. Freeman gave a deposition for purposes of trial that was read into the record. Prior to doing so, Dr. Harrison objected to some of Dr. Freeman's testimony, and the trial court ordered that certain portions of Dr. Freeman's testimony were to be excluded. The trial court allowed Dr. Freeman's testimony that "one in seven hundred procedures every year done in women in [Tucker's] age group resulted in iatrogenic[1] ovarian failure," id. at 162, but excluded his testimony that one in 270,000 women in Tucker's age group who have not had the procedure suffer ovarian failure and thus,

> the risk of having this procedure versus the risk in an entire year that this condition would occur greatly favors the procedure. The procedure is far, far more likely, more than 99 percent more likely to be the cause of ovarian failure

---

[1] "Iatrogenic" means "as a result of the procedure." Tr. at 162.

4

when it occurs after someone's had that procedure, rather than it occurring coincidentally and not due to the procedure.

Appellant's Appendix at 143 (quoting from Dr. Freeman's complete deposition).

## A. Standard of Review

The admissibility of an expert's testimony is governed by Evidence Rule 702, which provides:

(a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

In order for a witness to qualify as an expert, "(1) the subject matter [must be] distinctly related to some scientific field, business or profession beyond the knowledge of the average lay person; and (2) the witness [must be] shown to have sufficient skill, knowledge or experience in that area so that the opinion will aid the trier of fact." Bacher v. State, 686 N.E.2d 791, 800 (Ind. 1997). The proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the expert's testimony is based. McGrew v. State, 682 N.E.2d 1289, 1290 (Ind. 1997). Once the admissibility of the expert's opinion is established under Rule 702, "then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact." Bennett v. Richmond, 960 N.E.2d 782, 786-87 (Ind. 2012) (quotation omitted).

In determining whether expert testimony is reliable, the trial court acts as a "gatekeeper" to ensure that the expert's testimony rests on a sufficiently reliable foundation and is relevant to the issue at hand so that it will assist the trier of fact. Wallace v. Meadow Acres Manufactured Hous., Inc., 730 N.E.2d 809, 812 (Ind. Ct. App. 2000), trans. denied. "When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." Hannan v. Pest Control Servs., 734 N.E.2d 674, 679 (Ind. Ct. App. 2000), trans. denied. There is no specific test or set of factors which must be considered in order to satisfy Evidence Rule 702(b), but some relevant considerations include whether the theory or technique can be empirically tested, whether it has been subjected to peer review and publication, and whether it has gained widespread acceptance. Id. at 679-80. Ultimately, deciding whether expert testimony is admissible is a matter within the discretion of the trial court. Wallace, 730 N.E.2d at 812. We will reverse a trial court's decision to exclude evidence only if that decision "is clearly against the logic and effect of the facts and circumstances before the Court, or the reasonable, probable and actual deductions to be drawn therefrom." Id. (quotation omitted). We presume that the trial court's decision is correct, and the burden is on the party challenging the decision to persuade us that the trial court has abused its discretion. Bennett, 960 N.E.2d at 786.

## B. Excluding Dr. Freeman's Testimony

Tucker contends the trial court abused its discretion in excluding Dr. Freeman's probability testimony about causation because Dr. Freeman satisfied all the requirements for offering his expert opinion. There seems to be no dispute that Dr. Freeman has sufficient education and experience in the field of epidemiology, a field beyond the knowledge of the average lay person. We therefore focus our discussion on whether his testimony is relevant to the issue at hand and would assist the trier of fact.

The elements of a medical malpractice case are that: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused the plaintiff's injuries. Cutter v. Herbst, 945 N.E.2d 240, 247 (Ind. Ct. App. 2011). The pertinent issue in this case is whether the surgery as performed by Dr. Harrison was a proximate cause of the ovarian failure and subsequent infertility suffered by Tucker. See Singh v. Lyday, 889 N.E.2d 342, 357 (Ind. Ct. App. 2008) ("To hold a defendant liable for a plaintiff's injury, the defendant's act or omission must be deemed to be a proximate cause of that injury.") (internal quotation omitted), trans. denied.

The parties have not cited, and our research has not disclosed, any Indiana case directly addressing the admissibility of epidemiological evidence, in a medical malpractice case or otherwise. Tucker notes that epidemiological testimony has been accepted in litigation across the country, citing several cases from other jurisdictions, and urges that it be allowed here as well.[2] For instance, in Mendes-Silva v. U.S., 980 F.2d 1482, 1485 (D.C. Cir.

---

[2] Lee v. A.C. & S. Co., Inc., 542 A.2d 352 (Del. Super. Ct. 1987), provides the following excellent

1993), the circuit court held epidemiological expert opinion testimony purporting to show a link between the plaintiff's encephalomyelitis and the combined administration of two vaccines on the same day was admissible and sufficient to withstand summary judgment in a federal tort claims action. The circuit court in Ellis v. Int'l Playtex, Inc., 745 F.2d 292, 305 (4th Cir. 1984), held the district court committed reversible error in excluding as hearsay epidemiological studies indicating a statistically significant link between tampon use and Toxic Shock Syndrome in an action against a manufacturer alleging tampons caused the death of a user. Accord Kehm v. Proctor & Gamble Mfg. Co., 724 F.2d 613, 620 (8th Cir. 1983) (holding epidemiological studies analyzing statistical relationship between tampon use and incidents of toxic shock syndrome were admissible testimony over a hearsay objection in products liability action). Though not using the word "epidemiology," several Indiana cases have considered the admissibility of expert testimony of causation in similar situations. See Norfolk S. Ry. Co. v. Estate of Wagers, 833 N.E.2d 93 (Ind. Ct. App. 2005) (holding expert testimony that exposure to diesel fumes and asbestos at work played a significant role in

---

description of epidemiology, particularly in reference to its use in the legal context:

> Epidemiology has been defined as:
>> The science of dealing with the occurrence and distribution of diseases, especially of epidemic and endemic diseases.
>
> It is also defined as:
>> The field of science dealing with the relationships of the various factors which determine the frequencies and distributions of an infectious process, a disease, or a physiological state in a human community.
>
> Hence, a person who testifies as an expert in epidemiology provides information concerning the frequency and distribution of the occurrence of a particular disease or malady. The focus of the expertise is upon the frequency in which a particular disease is likely to occur within a segment of the population who have lived under a particular condition. The epidemiologist's function does not extend to determination of the physical condition or symptoms of an individual.

Id. at 354 (citations omitted).

decedent's lung cancer was admissible), trans. denied; Hottinger v. Trugreen Corp., 665 N.E.2d 593 (Ind. Ct. App. 1996) (holding expert testimony regarding correlation between plaintiff's injuries and herbicide exposure was admissible), overruled on other grounds by Dow Chem. Co. v. Ebling ex rel. Ebling, 753 N.E.2d 633 (Ind. 2001).

None of these cases, however, are medical malpractice cases and they are therefore not directly applicable. As noted in DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941 (3d Cir. 1990), which discussed epidemiological evidence of the statistical relationship between a morning sickness drug and birth defects, "[e]pidemiological studies do not provide direct evidence that a particular plaintiff was injured by exposure to a substance." Id. at 945. The instrumentality in the cited cases was the same for the entire statistical population – administration of drugs, use of tampons, or exposure to a given substance – and the epidemiological studies were but circumstantial evidence of cause and effect. The question here, however, is not whether this type of surgery is associated with an increase in ovarian failure; the question is whether Dr. Harrison's negligence in performing the surgery caused Tucker's ovarian failure. See id. at 945 n.6 ("Epidemiological evidence, like other generalized evidence, deals with categories of occurrences rather than particular individual occurrences. Epidemiological studies address questions such as 'Does exposure to this chemical increase the incidence of cancer in a population?' but not 'Did exposure to this chemical cause a particular person's cancer?'") (quoting Dore, A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact, 7 Harv. Envtl. L. Rev. 429, 436 (1983)).

Dr. Freeman's testimony was based upon a statistical analysis of a population of women aged eighteen to twenty-two who had "a procedure on the ovaries of any kind" in a period of time encompassing Tucker's surgery. Tr. at 162. He did not base his opinion upon any analysis of Tucker's physical condition or of Dr. Harrison's medical care. In fact, he testified that determining whether "any malpractice on the part of Dr. Harrison caused Ashley Tucker's ovarian failure" is "beyond the scope of what I do and beyond the scope of my expertise." Id. at 171. An expert in one field of expertise cannot offer opinions in other fields absent a requisite showing of competency in that other field. Hannan, 734 N.E.2d at 679. In Bennett v. Richmond, 960 N.E.2d 782, 789 (Ind. 2012), a psychologist who personally evaluated the plaintiff in a personal injury case was qualified to offer his expert opinion that the plaintiff suffered a traumatic brain injury as a result of a car accident despite not being a medical doctor, because he "clearly demonstrated" his knowledge and experience with traumatic brain injuries and his familiarity with the specific facts of the case. Cf. Dan Cristiani Excavating Co., Inc. v. Money, 941 N.E.2d 1072, 1080 (Ind. Ct. App. 2011) (holding certified nurse life care planner was properly allowed to testify as an expert regarding the life care plan – a list of anticipated future health and medical needs and expenses over the plaintiff's remaining life expectancy as determined from her review of reports and opinions of physicians about the treatments, procedures, and care the plaintiff would require – because it was clear she was not offering a medical opinion about future treatment and her testimony was limited to her specific area of expertise).

10

Dr. Freeman is not a medical doctor. He may be qualified to offer a <u>mathematical</u> opinion, but he was not shown to be qualified to offer a <u>medical</u> opinion as to causation. Tucker is required to show that Dr. Harrison was the proximate cause of her injuries. Testimony establishing that the <u>fact</u> of a surgery makes ovarian failure more likely could mean that Dr. Harrison did everything right and ovarian failure is simply a risk of having any sort of ovarian surgery. It does not establish a causal relationship between Dr. Harrison's acts or omissions and Tucker's injury. Although probability testimony may be appropriate in certain circumstances, here, allowing Dr. Freeman to testify it was ninety-nine percent more likely that the surgery caused ovarian failure than that it was coincidence is not relevant to nor would it assist the jury in making the determination of whether Dr. Harrison's performance of the bilateral cystectomy caused Tucker's ovarian failure, and it runs the substantial risk of misleading the jury. <u>See</u> Ind. Evidence Rules 401 and 403 (relevant evidence has any tendency to make the existence of a fact is in issue more or less probably but may be excluded if its probative value is substantially outweighed by the danger of confusion of the issues or misleading the jury).[3]

In sum, Dr. Freeman may be qualified to offer expert epidemiological opinion testimony, but epidemiological testimony is not relevant to the issue of causation in this medical malpractice case and the trial court accordingly did not abuse its discretion in excluding part of his testimony.

---

[3] This is not to say epidemiological evidence is <u>irrelevant</u> and could never be admitted in a medical malpractice case. In the appropriate case, it could certainly bolster other testimony of medical causation, but it does not replace it.

## II. Bias Testimony

Tucker contends the trial court erred in prohibiting her from questioning a witness about system-wide bias of qualified health providers in Indiana. Prior to trial, Tucker had sent notice of her intention to send non-party requests for production to various entities and individuals regarding "the inherent financial interest all of [Harrison's] expert witnesses have in the outcome of this case." Appellant's App. at 121. On Harrison's motion, the trial court quashed the requests, issuing the following order:

> . . . The requests for production seek evidence concerning the five experts' payments into the Patient Compensation Fund and the rebates they have received from the Patient Compensation Fund. The purpose of the discovery requests is to show bias in that each of the witnesses allegedly has an interest in minimizing the payments from the Patient Compensation Fund so that their payments into the Compensation Fund are smaller or their rebates from the Compensation Fund are larger.
>
> The Court finds this particular argument of bias would not be admitted into evidence and therefore that the discovery requests are not likely to lead to admissible evidence. The issue of whether any party has insurance may not be presented to the jury. Similarly, the issue of whether the experts, who are medical providers, have insurance cannot be presented to the jury because, by implication, it implies that the defendants, also medical providers, have insurance. Indiana has a statutory procedure for obtaining expert testimony in any such case through a medical review panel. This procedure benefits both parties by establishing a standard procedure for determining whether there is evidence supporting either party's position. While the opinion of the Medical Review Panel is not binding, it is useful to both plaintiff and defendants. Physicians are required to participate in panels. All physicians are required to obtain professional liability insurance.
>
> The constitutionality of the medical malpractice laws has been regularly upheld over the course of several decades. Plaintiff's argument that a witness is biased because the witness is a participant in the Indiana Patient Compensation Fund is not a competent argument to present to the jury.

Id. at 134-35.

At trial, Tucker called Dr. David McLaughlin, a gynecologist, as an expert witness. Dr. McLaughlin first testified to his review of Tucker's medical files and his opinion of Dr. Harrison's performance of the surgery. Tucker's counsel then asked him if he had served on medical review panels before, which he had, and whether it was true that medical review panelists "don't have any bias." Tr. at 35. Harrison objected and the following discussion occurred out of the jury's presence:

> [Harrison's counsel]: . . . [Dr. McLaughlin's] service on panels is completely irrelevant to this case. It's not the three doctors that served on this panel. He doesn't know whether the doctors in this case were biased or not and this is absolutely irrelevant and unduly prejudicial.
> [Tucker's counsel]: [Harrison's counsel] told the jury that these were unbiased panel members and if allowed Dr. McLaughlin will say that every doctor in Indiana has a bias on the medical review panels. . . .
> * * *
> [The Court]: I'm going to sustain the objection. This is an area – it's an issue that you raised that I've ruled on is not to be before the jury and I'll tell the jury to disregard the question. . . .
> [Tucker's counsel]: Well, yeah, I probably should make an offer to prove then.
> [The Court]: Okay.
> * * *
> [Tucker's counsel]: . . . As I said before his answer would have been that, yes, every doctor in Indiana does have an interest and are biased. . . . If allowed to testify Dr. McLaughlin will testify that there is a financial interest in that the physicians [sic] surcharges go down as a result of less payouts than are intended. That is an actuarial thing that's done every year. He didn't discuss that (inaudible) probably doesn't know, but he does know and he will answer, if he was allowed to testify that that is an effort by the physicians in Indiana to keep these – to keep the recoveries down so that their surcharges will go down.

Id. at 35-38. Tucker contends the trial court erred in excluding this evidence from the jury's consideration.

Essentially, Tucker's proffered evidence alleges bias on the part of every Indiana physician because they are all participants in the Patient's Compensation Fund, which acts as

13

a sort of supplemental mutual insurance provider for all qualified health care providers licensed in Indiana, and therefore have a financial interest in whether payouts are made from the Fund. Indiana Evidence Rule 411 provides:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

The purpose of Rule 411 is "to prevent juries from inferring fault or calculating damages based on parties' liability coverage or lack thereof." Spaulding v. Harris, 914 N.E.2d 820, 830 (Ind. Ct. App. 2009), trans. denied. Although Rule 411 generally bars insurance evidence, it may be admitted for some purpose other than implying fault or influencing a damage award. Id. "If the evidence is offered for a purpose not prohibited by Rule 411, admissibility is governed by the balancing test of Rule 403, and exclusion may be appropriate if the fact to be proven is not in genuine dispute." Id. (quotation and citation omitted). Evidence Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Rulings concerning the relevancy of evidence are within the trial court's discretion and we will not disturb such rulings unless they are clearly erroneous. Wineinger v. Ellis, 855 N.E.2d 614, 618 (Ind. Ct. App. 2006), trans. denied.

We begin with a brief overview of the obligations of doctors with respect to the Patient's Compensation Fund and medical review panels. Any amount due from a medical

14

malpractice judgment or settlement in excess of the total liability of all liable health care providers is paid from the Patient's Compensation Fund, up to the statutory limit. Ind. Code § 34-18-14-3. The Patient's Compensation Fund is funded by an annual surcharge levied on all qualified health care providers in Indiana. Ind. Code § 34-18-5-1. "The amount of the surcharge shall be determined based upon actuarial principles and actuarial studies and must be adequate for the payment of claims and expenses from the patient's compensation fund." Ind. Code § 34-18-5-2(c). The minimum annual surcharge is $100, and is to be determined not later than July 1 of each year. Ind. Code § 34-18-5-2(e), (f). The Indiana Medical Malpractice Act provides a mechanism by which medical malpractice complaints are first considered by a medical review panel. The panel is comprised of one attorney and three health care providers. Ind. Code § 34-18-10-3. "[A]ll health care providers in Indiana . . . who hold a license to practice in their profession shall be available for selection as members of the medical review panel." Ind. Code § 34-18-10-5. A health care provider may only be relieved from serving on a panel by serving an affidavit on the panel chairman setting out facts showing that service "would constitute an unreasonable burden or undue hardship." Ind. Code § 34-18-10-12(c). Each member of the panel is required to take an oath in writing that, among other things, he or she will "render my opinion without bias[.]" Ind. Code § 34-18-10-17(e). Tucker contends that because all doctors participate in the Patient's Compensation Fund, all doctors have a financial interest in the outcome of every medical malpractice case in order to keep their annual surcharges to a minimum, and therefore, the

15

members of the medical review panel were biased against Tucker's claim, evidence of which is relevant and not unduly prejudicial. We disagree.

Any specific bias on the part of the three members of the medical review panel in this case would certainly be relevant. See Ind. Evidence Rule 616 ("For the purpose of attacking the credibility of a witness, evidence of bias . . . of the witness for or against any party to the case is admissible."). Each member of the review panel signed the required oath. Dr. Michelle Murphy, one of the review panel members, testified at trial that she signed the oath, that she took the oath seriously, and that she had no bias for either Tucker or Dr. Harrison when she considered the evidence and gave her opinion. Tr. at 79-80. Dr. Margaret Miser, also a member of the review panel, also testified that she took the oath, honored it, and complied with it in her work on the review panel. Id. at 364-65.

Despite Tucker's contention that she was prohibited from countering this evidence that the medical review panel doctors were unbiased, see Brief of Appellant at 18, Tucker's proffered evidence does not directly contradict this testimony. It does not allege specific bias on the part of the specific expert witnesses involved in this trial; it alleges system-wide bias, which runs the risk of confusing the issues and misleading the jury without adding any probative evidence to the question of whether or not Dr. Harrison was negligent. Tucker's proffered evidence merely speculates through Dr. McLaughlin's expected testimony that every doctor in Indiana – all of whom are required by law to participate in the Patient's Compensation Fund and to serve as review panel members – have such an interest in limiting their financial exposure by limiting payouts from the Patient's Compensation Fund that they

16

would render opinions based on such interest. However, Tucker has not shown that Dr. McLaughlin is qualified to testify about system-wide bias, if any exists, and she offers no evidence of the amount of the financial exposure doctors allegedly face from which the likelihood of such skewed opinions could be assessed. By statute, the financial exposure could be as little as $100 per year. See Ind. Code § 34-8-5-2(e).

When balanced against the prejudicial effect of allowing evidence of professional liability insurance, the potential for bias in this case is so remote as to warrant exclusion. See Wallace v. Leedhanachoke, 949 S.W.2d 624, 628 (Ky. Ct. App. 1996) (after reviewing cases from numerous jurisdictions, agreeing with the majority that the "mere fact that two physicians shared a common insurance carrier – absent a more compelling degree of connection – does not clearly evince bias by the expert, and its arguable relevance or probative value is insufficient to outweigh the well-established rule as to the inadmissibility of evidence as to the existence of insurance."). The trial court did not clearly err in excluding the proffered bias testimony.

### III. Res Ipsa Loquitur Instruction

Tucker also contends the trial court erred in refusing to give her proposed jury instruction regarding res ipsa loquitur:

> You may assume that an act of medical negligence took place if Plaintiff Ashley Tucker proves the following by the greater weight of the evidence:
> (1) Plaintiff was under Dr. Harrison's care when the harm occurred;
> (2) Dr. Harrison had exclusive control of Plaintiff Ashley Tucker's actions or reactions when the harm occurred;
> (3) the harm was of a kind that would not have occurred unless an act of medical negligence took place; and

17

(4) Defendant Dr. Harrison had exclusive control of the instrument which caused the harm.

If you conclude that an act of medical negligence took place, you must then consider that fact with all other evidence in deciding whether [defendant] was liable.

Brief of Appellant at 20.[4] Dr. Harrison objected, specifically to the lack of evidence supporting element three. The trial court found that res ipsa loquitur "does not apply to the facts of this case" and declined to give the instruction. Tr. at 327.

The decision to give or deny a tendered jury instruction is largely left to the sound discretion of the trial court. St. Mary's Med. Ctr. of Evansville, Inc. v. Loomis, 783 N.E.2d 274, 282 (Ind. Ct. App. 2002). We review the trial court's decision only for an abuse of that discretion. Johnson v. Wait, 947 N.E.2d 951, 957-58 (Ind. Ct. App. 2011), trans. denied. On review, we will reverse the trial court's refusal to give a tendered instruction when the instruction is a correct statement of the law; it is supported by the evidence; and it does not repeat material already covered by other instructions. Id. at 958.

The doctrine of res ipsa loquitur is an exception to the general rule that the mere fact of an injury will not create an inference of negligence. Syfu v. Quinn, 826 N.E.2d 699, 703 (Ind. Ct. App. 2005). Res ipsa loquitur is a rule of evidence which allows an inference of negligence to be drawn based on the facts and circumstances of the injury. Johnson, 947 N.E.2d at 960. The doctrine may be applied and negligence inferred when the plaintiff establishes that the injuring instrumentality was within the defendant's exclusive management and control and the accident is of a type that does not ordinarily happen if those

---

[4] This instruction is reproduced as it appears in Tucker's brief. It appears without citation to the

18

who have the management and control exercise proper care. Ross v. Olson, 825 N.E.2d 890, 893 (Ind. Ct. App. 2005), trans. denied. In determining if the doctrine is applicable, the question is whether the incident more probably resulted from the defendant's negligence than from another cause. Rector v. Oliver, 809 N.E.2d 887, 890 (Ind. Ct. App. 2004), trans. denied. The plaintiff may show, by common knowledge or expert testimony, that the injury is one that would not ordinarily occur in the absence of due care on the part of those controlling the instrumentality. Ross, 825 N.E.2d at 894.

As our supreme court has explained:

[T]here are some situations in which a physician defendant's allegedly negligent act or omission is so obvious as to allow plaintiffs to rely on the doctrine of res ipsa loquitur. Juries do not need an expert to help them conclude, say, that it is malpractice to operate by mistake on the wrong limb. . . .

Wright v. Carter, 622 N.E.2d 170, 171 (Ind. 1993). Thus, our appellate courts have found res ipsa loquitur applied when a patient's oxygen mask caught fire during surgery, see Cleary v. Manning, 884 N.E.2d 335, 339 (Ind. Ct. App. 2008), Gold v. Ishak, 720 N.E.2d 1175, 1184 (Ind. Ct. App. 1999), trans. denied; or when foreign objects are left in the body following surgery, see Wright, 622 N.E.2d at 172 (wire left in breast following biopsy); see also Ziobron v. Squires, 907 N.E.2d 118, 126-27 (Ind. Ct. App. 2008) (citing similar cases).

Application of this exception in such cases is appropriate when limited to situations in which the complained-of conduct is so obviously substandard that one need not possess medical expertise in order to recognize the breach. It is otherwise when the question involves the delicate inter-relationship between a particular medical procedure and the causative effect of that procedure upon a given patient's structure, endurance, biological makeup, and pathology.

---

record.

<u>Malooley v. McIntyre</u>, 597 N.E.2d 314, 318 (Ind. Ct. App. 1992). As the trial court found, this case is one of the latter.

Tucker's ovarian failure and subsequent infertility is not a situation that jurors could look at and know from common experience was obviously caused by substandard conduct. The expert witnesses disagreed as to whether the laparoscopic surgery Dr. Harrison performed with monopolar scissors was the cause of Tucker's ovarian failure. The medical review panelists opined during the review process as well as testified during trial that Dr. Harrison was not the cause of the ovarian failure. <u>See</u> Tr. at 61 (Dr. Murphy, medical review panelist, testifying that in her opinion, ovarian failure following the surgery was a coincidence); <u>id.</u> at 397 (Dr. Miser, medical review panelist, testifying that in her opinion, Tucker had been in ovarian failure prior to the surgery masked by her use of birth control pills and Dr. Harrison did not cause the ovarian failure). Tucker's experts Dr. McLaughlin and Dr. Denniz Zolnoun each testified that Tucker's ovarian failure was caused by Dr. Harrison's negligence in performing the cystectomy. Dr. McLaughlin also testified, however, that destruction of the ovaries through electrosurgery is a possible risk, although "a really rare risk," of a cystectomy even if it is done properly. <u>Id.</u> at 24; <u>see also id.</u> at 202 (Dr. Harrison testifying that infertility was not a high risk of the surgery). On this evidence, it cannot be said that Tucker's injury was one that would not have occurred in the absence of negligence.

As the trial court stated in rejecting the res ipsa loquitur instruction: "the contentions are harm occurred during surgery, harm did not occur during surgery, harm occurred

20

independently of surgery. I don't think that's a res ipsa loquitur case." Id. at 327. From the expert testimony presented, the jury could have drawn an inference that Tucker suffered harm because Dr. Harrison was negligent, or it could have drawn an inference that Tucker suffered harm even though Dr. Harrison exercised the appropriate standard of care and skill.

Accordingly, Tucker was not entitled to a res ipsa loquitur instruction and the trial court did not abuse its discretion in denying the tendered instruction.

## Conclusion

The trial court did not abuse its discretion in excluding Tucker's expert epidemiological probability testimony, in excluding testimony concerning system-wide bias, or in instructing the jury. Accordingly, the judgment for Dr. Harrison is affirmed.

Affirmed.

BAILEY, J., and MATHIAS, J., concur.