## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEYS FOR APPELLANT

Stephen B. Caplin
Stephen B. Caplin, P.C.
Indianapolis, Indiana

Richard L. Schultheis
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
CHRISTOPHER T. HAUGH, M.D.
AND EVANSVILLE SURGICAL
ASSOCIATES

James W. Brauer
Katz & Korin, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE ST.
MARY'S MEDICAL CENTER

Patrick A. Shoulders
Steven K. Hahn
Allyson R. Breeden
Ziemer, Stayman, Weitzel & Shoulders, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Yovanda R. Vaughn, individually and as special representative of the Estate of Anderson Vaughn, Jr., deceased,

*Appellant-Plaintiff,*

v.

April 23, 2015

Court of Appeals Case No. 82A05-1408-CT-393

Appeal from the Vanderburgh Superior Court
The Honorable Mary Margaret Lloyd, Judge
Cause No. 82D03-1306-CT-2728

Christopher T. Haughn, M.D.,
Evansville Surgical Associates,
and St. Mary's Medical Center of
Evansville, Inc., d/b/a St.
Mary's Medical Center,

*Appellees-Defendants,*

**Bradford, Judge.**

# Case Summary

In 2008, Anderson Vaughn, now deceased, underwent surgery to remove a cancerous tumor from his esophagus. The surgery was performed at Appellee-Defendant St. Mary's Medical Center ("St. Mary's") by Appellee-Defendant Christopher Haughn, M.D., a member of Appellee-Defendant Evansville Surgical Associates (collectively "Defendants").[1] As a result of complications during the surgery, Anderson suffered damage to his aorta. Anderson's wife, Appellant-Plaintiff Yovanda Vaughn ("Vaughn") brought a medical malpractice claim against Defendants. In support of her claim, Vaughn offered an expert witness affidavit from a sleep specialist who opined that Dr. Haughn suffered a "sleep attack" while performing Anderson's surgery which caused Dr. Haughn to temporarily lose awareness and cause damage to Anderson's

---

[1] Dr. Haughn and Evansville Surgical Associates are represented separately from St. Mary's, and will be referred to collectively as "ESA."

aorta. The trial court granted ESA's motion to strike Vaughn's expert affidavit and granted Defendants' motions for summary judgment. In this appeal, Vaughn argues that the trial court erred by granting the motion to strike and the motions for summary judgment. We affirm.

# Facts and Procedural History

[2] On the morning of March 18, 2008, Dr. Christopher Haughn, with the assistance of Dr. Bruce Adye, began a laparoscopic esophagectomy to remove a cancerous tumor from Anderson Vaughn's esophagus ("the procedure" or "the surgery").[2] The goal of the procedure was to maneuver the trocar through Anderson's body to the location of the tumor, evaluate the nature and extent of the cancer, and ultimately remove the tumor if it was operable. Regrettably, a complication occurred early in the procedure. As Dr. Haughn was inserting the trocar, the trocar went through the abdominal cavity, through the retroperitoneum, and punctured the aorta. Soon thereafter, Dr. Haughn saw blood in the trocar, recognized the complication, and immediately converted the procedure to an aortobiiliac bypass to repair the aorta. Dr. Adye

---

[2] A laparoscopic surgery, or minimally invasive surgery, involves the insertion of an endoscopic trocar into a patient's body through a small incision. The trocar is equipped with a small camera at the tip which relays video to monitors in the surgical suite allowing the surgeons to observe the location of the trocar within the patient's body via the monitors. *What is Laparoscopic Surgery*, Center for Pancreatic and Biliary Diseases, University of Southern California.
http://www.surgery.usc.edu/divisions/tumor/pancreasdiseases/web%20pages/laparoscopic%20surgery/WHAT%20IS%20LAP%20SURGERY.html (last visited April 10, 2015)

successfully repaired the injury to the aorta, although Anderson had some further health issues as a result of the injury. Anderson died on May 5, 2010.

[3] Sometime after the surgery, Vaughn filed a complaint against Defendants. On August 20, 2012, a medical panel determined that "[t]he evidence does not support the conclusion that the [Defendants] failed to meet the applicable standard of care as charged in the complaint." Appellant's App. p. 30-32. On June 13, 2013, Vaughn filed a complaint against Defendants in the Vanderburgh Superior Court. Both ESA and St. Mary's filed motions for summary judgment designating the panel decision as evidence. In response, Vaughn designated as evidence an affidavit by Dr. Marvin Vollmer as well as portions of Dr. Haughn's deposition.

[4] Dr. Vollmer is a neurologist and sleep specialist. During his deposition, Dr. Vollmer testified that he believed Dr. Haughn suffered a "sleep attack" while performing the procedure which caused him to lose control of the surgical instruments and ultimately cause the injury to Anderson's aorta. Appellee's App. 8. Dr. Vollmer based his opinion on, among other things, medical records for Dr. Haughn and the depositions of Dr. Haughn and Dr. Haughn's physician, Dr. David Cocanower.

In 2006, Dr. Haughn began seeing Dr. David Cocanower for treatment of obstructive sleep apnea. As treatment, Dr. Haughn used a BiPAP[3] machine each night while sleeping and took Concerta each morning.[4] Dr. Haughn's BiPAP machine had an electronic monitoring system which automatically catalogued data on the dates and periods of time when Dr. Haughn was using the machine. Dr. Cocanower testified that Dr. Haughn never had issues complying with treatment and that the electronic data, recorded between 2006 and 2012, indicated that Dr. Haughn used his BiPAP machine ninety-eight percent of the time. Dr. Cocanower had no record of BiPAP data on Dr. Haughn for certain periods between 2006 and 2012 including the period between August 12, 2007 and June 18, 2008. Dr. Cocanower noted that gaps in patients' BiPAP data are common because patients often forget or neglect to bring the information to their appointments.

On May 29, 2014, ESA filed a motion to strike Dr. Vollmer's affidavit and in June of 2014, Defendants designated additional evidence in support of their respective motions for summary judgment, including the depositions of Dr. Adye, Dr. Vollmer, Dr. Haughn, and portions of Dr. Cocanower's deposition.

---

[3] BiPAP, or bilevel positive airway pressure, is a treatment that applies air pressure through a mask to keep a patient's respiratory airways open.

[4] Dr. Haughn was taking Concerta as treatment for both attention deficit disorder and the symptoms of sleep apnea.

On July 23, 2014, the trial court granted the motion to strike and the Defendants' motions for summary judgment.

# Discussion and Decision

Vaughn raises two issues on appeal: (1) whether the trial court abused its discretion by striking the affidavit of Dr. Vollmer, and (2) whether the trial court erroneously granted Defendants' motions for summary judgment.

# I. Motion to Strike Dr. Vollmer's Testimony

## A. Standard of Review

> A trial court has broad discretion in ruling on a motion to strike. Generally, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. This standard also applies to decisions to admit or exclude expert testimony. We reverse a trial court's decision to admit or exclude evidence only if that decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.

*Norfolk S. Ry. Co. v. Estate of Wagers*, 833 N.E.2d 93, 100-01 (Ind. Ct. App. 2005) (citations omitted).

Rule 702 of the Indiana Rules of Evidence provides as follows with regards to the admissibility of expert witness testimony:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

The party offering expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the expert's testimony is based. *Tucker v. Harrison*, 973 N.E.2d 46, 49 (Ind. Ct. App. 2012) (citing *McGrew v. State*, 682 N.E.2d 1289, 1290 (Ind. 1997)).

> In determining whether expert testimony is reliable, the trial court acts as a "gatekeeper" to ensure that the expert's testimony rests on a sufficiently reliable foundation and is relevant to the issue at hand so that it will assist the trier of fact. When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* (citations and quotations omitted). To be admissible, an expert's opinion that an event caused a particular injury must be based on more than coincidence and supported by evidence in the record, establishing a standard of evidentiary reliability. *Norfolk*, 833 N.E.2d at 103.

# B. Analysis

Defendants argue that Dr. Vollmer's affidavit was properly stricken because his opinions are speculative and unsupported by facts in the record. The relevant portions of Dr. Vollmer's affidavit, which Vaughn argues create a material issue of fact, are as follows:

> 4. The Reviewed Documents reveal the following events and facts:
>
> * * *
>
> x. Dr. Haughn has no explanation as to how he pushed the trocar into the patient's aorta.

xi. Dr. Haughn does not remember pushing the trocar through the retroperitoneum and into the aorta.

\* \* \*

xiii. Dr. Haughn was known to have problems with excessive sleepiness in the morning of sufficient severity to warrant-escalating doses of amphetamine-like medications, despite medical contradiction due to his hypertension.

5. I hold the opinions that I express in this Affidavit to a reasonable degree of medical certainty. I am familiar with the standard of care required of physicians who have personal health and wellness problems such as Dr. Haughn. The standards require, among other things, that all physicians not allow their personal health and wellness problems interfere with a patient's safety. It is my opinion that at time the Procedure was performed on March 18, 2008:

\* \* \*

b. Dr. Haughn was suffering from Obstructive Sleep Apnea Syndrome and attention deficit and significant problems waking up in the morning marked by excessive sleepiness.

c. Because of his medical conditions, Dr. Haughn would have difficulty maintaining the attention necessary to control surgical instruments while performing the Procedure.

d. Dr. Haughn could suffer from marked excessive sleepiness that would lead to the loss of awareness, memory, and control of instruments that happened during the Procedure.

e. In view of his training, it is my opinion that Dr. Haughn's loss of awareness, memory, and control of the surgical instruments during the Procedure was a result of his medical conditions.

Appellant's App. pp. 61-64.[5]

---

[5] Vaughn does not argue that there was any negligence in the methodology by which Dr. Haughn's performed surgery, only that Dr. Haughn was negligent for performing surgery while impaired.

[11] Dr. Vollmer's ultimate conclusion–that Dr. Haughn was impaired by his sleep apnea and suffered a "sleep attack" while performing surgery–is based on the purported facts listed in his affidavit above: Dr. Haughn does not remember, nor has any explanation for, pushing the trocar through Anderson's abdominal cavity and into his aorta, and Dr. Haughn had problems with excessive sleepiness in the morning. However, these factual assertions are unsupported by the record. Dr. Haughn testified that he immediately became aware that the trocar had entered the aorta upon seeing blood in the trocar. Dr. Haughn went on to provide a detailed explanation for why he believed the trocar went deeper then intended and punctured the aorta.

> Q: What is your explanation as to the fact that you didn't see abdominal cavity?
>
> A: I can't say for certain why I never saw it. The – you know, on extensive reflection of this the best answer I could come up with was that the tissue of his anterior abdominal wall was lax or had a low compliance[6] or high compliance that – and then with weight loss the fat in the abdomen that everybody has was decreased and this made it easier to push the contents of the abdominal cavity to the side so that the trochar instead of entering the abdominal cavity entered the retroperitoneum right after going through the anterior abdominal wall.
>
> Q: So it went through the anterior abdominal wall. Did it go through the anterior peritoneum?
>
> A: Yes. It would – so it went through the anterior fascia, the muscle, the posterior fascia, the peritoneum, and then the retroperitoneum. In other words, the abdominal cavity, instead of being a cavity with space, was compressed to the retroperitoneum.

---

[6] Dr. Haughn later explained that "compliance" refers to "how stretchy the abdominal wall is," appellant's app. p. 214, and that Anderson's abdominal wall had significant give due to weight loss and chemotherapy.

Q: Okay. That's what you think happened?

A: Yes.

Appellant's App. p. 208. When Dr. Adye was asked the same question, he provided a similar explanation that the trocar may have traveled further than was desired due to "[Anderson's] deconditioned state[,] his weight loss, his adipose layer wasn't as thick. Sometimes those things can happen without appreciable explanations, I think. It's hard to know." Appellant's App. p. 237. Furthermore, Dr. Adye testified that he observed and spoke with Dr. Haughn prior to and during the surgery and described Dr. Haughn's state of mind as "just like any other surgeon's, focused on the case, entirely appropriate…. Just like any of my other partners would be." Appellant's App. p. 231. Contrary to Dr. Vollmer's assertions, we have found no evidence in the record that indicates that Dr. Haughn lost consciousness, awareness, or control of his instruments at any time during the procedure.

[12] Additionally, although Dr. Haughn did suffer from sleep apnea, he was actively being treated. There is no evidence that Dr. Haughn was suffering from excessive sleepiness or other symptoms of sleep apnea at the time of the surgery. Dr. Haughn testified that his sleep apnea has no impact on his ability to function so long as he is treated. He also testified that he had been using his BiPAP machine on the nights immediately preceding the surgery and had taken his medication that morning. Dr. Haughn's assertions are supported by the testimony of Dr. Haughn's treating physician, Dr. Cocanower. Dr. Cocanower indicated that the electronic data from Dr. Haughn's BiPAP machine indicated that he was consistently using the machine. "[I]f you take all his compliance

data as a whole and then even separate, it never looked like he had a problem with compliance. He was way at the upper – using it ninety-eight percent of the time."[7] Appellant's App. p. 179. Dr. Cocanower went on to state that Dr. Haughn's treatment program was effective and that he had documented no abnormal sleepiness levels since Dr. Haughn began treatment in 2006.[8]

> Q: Doctor [Cocanower], during the time period that you treated Dr. Haughn, did you feel that the treatment you were providing him for his obstructive sleep apnea was effective?
>
> A: Yes. Based on what he told me and based on the [BiPAP data] and based on a study night that we did.
>
> Q: Your answer is yes, you do feel it was?
>
> A: Yes.
>
> Q: You feel it was effective in reducing his symptoms that he was experiencing?
>
> A: Yes. And that's actually documented in the record.
>
> * * *
>
> Q: …[B]ased on that [October 28th, 2008] report, does he appear to be stable with his sleep apnea?
>
> A: Yes. And that was my impression noted on that [report] in number one.

---

[7] Dr. Cocanower had previously indicated that the generally accepted standard for minimally effective BiPAP use is "[a]t least four hours 60 percent of the nights." Appellant's App. p. 178.

[8] Dr. Cocanower used a questionnaire known as the Epworth Sleepiness Scale to score his patients' sleepiness levels each time he saw the patient. Dr. Haughn's Epworth score was only in the abnormal range on his first visit to Dr. Cocanower before beginning treatment.

Appellant's App. p. 183. In addition to Dr. Cocanower and Dr. Haughn's testimony, Dr. Adye testified that he has "[never] seen any evidence of [Dr. Haughn] being impaired from sleep apnea." Appellant's App. p. 240.

[13] We have found no evidence in the record which supports Dr. Vollmer's conclusions that "[b]ecause of his medical conditions Dr. Haughn would have difficulty maintaining the attention necessary to control surgical instruments while performing," or that "Dr. Haughn could suffer from marked excessive sleepiness that would lead to the loss of awareness, memory, and control of instruments." Appellant's App. p. 64. Furthermore, there is no evidence that any individual present during Anderson's surgery witnessed Dr. Haughn lose awareness, memory, or control of the surgical instruments as Dr. Vollmer asserts.

[14] In addition to lacking a factual foundation on which to base his medical opinion, Dr. Vollmer's lack of surgical expertise also raises questions regarding the reliability of his opinion as to the causation of the injury. "An expert in one field of expertise cannot offer opinions in other fields absent a requisite showing of competency in that other field." *Tucker*, 973 N.E.2d at 51; (*See e.g. Bennett v. Richmond*, 960 N.E.2d 782, 789 (Ind. 2012) (despite not being a medical doctor, a psychologist was qualified to offer his expert opinion that the plaintiff suffered a traumatic brain injury as a result of a car accident because the psychologist demonstrated his knowledge and experience with traumatic brain injuries). Dr. Vollmer testified that he is not a surgeon, has never performed laparoscopic surgery or any other "major surgery," and does not consider himself an expert

in surgery. Appellee's App. 8. As such, Dr. Vollmer has no expert knowledge on the risks inherent in the type of laparoscopic surgery at issue here. Without such knowledge, Dr. Vollmer's proffered opinion, that it was Dr. Haughn's "sleep attack" which precipitated the injury to Anderson, seems nearer to dubious than reasonably reliable. When asked if an aortic perforation can occur during a laparoscopic procedure absent negligence, Dr. Vollmer said that that was "beyond [his] area of expertise to answer" and that he would "defer to a surgeon." Appellee's App. p. 27.

[15] To be admissible under Rule 702, an expert witness's testimony must offer knowledge based on more than subjective belief or unsupported speculation. *Norfolk*, 833 N.E.2d at 103. Based on the lack of facts supporting Dr. Vollmer's opinions as well as his inexperience with laparoscopic procedures, we think his assertions amount to little more than unsupported speculation. As such, we find that the trial court did not abuse its discretion in striking Dr. Vollmer's affidavit.

## II. Summary Judgment

[16] On appeal, our standard of review is the same as that of the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We construe all facts and reasonable inferences drawn from those facts in favor of the non-moving party. On appeal, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity. A party appealing from an order granting summary judgment has the burden of persuading the appellate tribunal that the decision was erroneous.

*Roberts v. Sankey*, 813 N.E.2d 1195, 1197 (Ind. Ct. App. 2004) (citations omitted).  A court must grant summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Briggs v. Finley*, 631 N.E.2d 959, 963 (Ind. Ct. App. 1994).

[17]  "In a medical negligence claim, the plaintiff must prove *by expert testimony* not only that the defendant was negligent, but also that the defendant's negligence proximately caused the plaintiff's injury."  *Clarian Health Partners, Inc. v. Wagler*, 925 N.E.2d 388, 392 (Ind. Ct. App. 2010) (emphasis added) (citing *Schaffer v. Roberts*, 650 N.E.2d 341, 342 (Ind. Ct. App. 1995)). [9]

[18]  Lacking the stricken Vollmer affidavit, Vaughn has no expert testimony supporting her negligence claim.  Without expert evidence, Vaughn's medical malpractice claim is unable to succeed.  Accordingly, the trial court did not err in granting the Defendants' motions for summary judgment.

[19]  The judgment of the trial court is affirmed.

Vaidik, C.J., and Kirsch, J., concur.

---

[9] Vaughn briefly points out the common knowledge exception to the expert evidence requirement which provides that a plaintiff in a medical malpractice case need not provide expert evidence when the alleged negligence is comprehensible to the jury without extensive technical knowledge. See *e.g. Chi Yun Ho v. Frye*, 880 N.E.2d 1192, 1200 (Ind. 2008) (the common knowledge exception applied to a medical malpractice action in which patient's oxygen match caught fire by an electrocautery unit.)  The intricacies of laparoscopic surgery are clearly a complex subject matter that requires expert evidence.  As such, we decline to apply the common knowledge exception to this case.