**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**September 2, 2022**

# In the Court of Appeals of Georgia

A22A0990. ADAMS et al. v. PIEDMONT HENRY HOSPITAL, INC. et al.

BROWN, Judge.

In this medical malpractice/wrongful death case, the plaintiffs, Carole Anne Adams, David Aaron Stephenson, Seth Patrick Conyers, and Kyle Russell Conyers, the surviving children of the decedent, Mary Patricia Conyers, sued Piedmont Henry Hospital, Inc., Piedmont Healthcare, Inc. d/b/a Piedmont Henry Hospital (collectively "Piedmont Henry"), Thomas R. Fitzsimmons, MD, Dr. Thomas R. Fitzsimmons, PC d/b/a Eagle's Landing Surgery, and Eagle's Landing Surgery, PC d/b/a Eagle's Landing Surgery (collectively "Dr. Fitzsimmons"), after Ms. Conyers allegedly died from a pulmonary embolism following an appendectomy performed by Dr.

Fitzsimmons at Piedmont Henry.[1] As to Piedmont Henry, the plaintiffs alleged that its nurses breached the standard of care owed to Ms. Conyers in failing to adequately assess her risk of thrombosis following surgery to ensure that she received necessary anticoagulants. The plaintiffs also alleged that the nurses did not appropriately use the sequential compression devices ordered by Dr. Fitzsimmons and failed to administer a pre-operative dose of Heparin.

The trial court granted summary judgment to Piedmont Henry, concluding that the plaintiffs failed to present sufficient evidence of causation as to the nurses.[2] The trial court also granted Dr. Fitzsimmons' motions to exclude the testimony of two of the plaintiffs' experts, and granted in part Dr. Fitzsimmons' motion to exclude the plaintiffs' rebuttal expert, ruling that he is permitted to give expert testimony at trial, but not permitted to offer new opinions on the standard of care that were not previously offered by the plaintiffs' experts. The plaintiffs appeal these rulings. For the reasons explained below, we reverse the trial court's grant of summary judgment to Piedmont Henry. As to the trial court's rulings on the expert witnesses, we: (1)

---

[1] Although pulmonary embolism was a "high probability," an autopsy was never performed, so the cause of death could not be definitely determined.

[2] Dr. Fitzsimmons also moved for summary judgment. The trial court denied his motion, and that order is not part of this appeal.

2

vacate the trial court's order limiting Dr. Caprini's testimony and remand the case with direction that the court re-evaluate its ruling as discussed below; (2) reverse the trial court's order excluding Dr. Hayes' standard-of-care opinions; and (3) affirm the trial court's order excluding the causation testimony of Dr. Freeman.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion. In doing so, we bear in mind that the party opposing summary judgment is not required to produce evidence demanding judgment for it, but is only required to present evidence that raises a genuine issue of material fact.

(Citation and punctuation omitted.) *Chybicki v. Coffee Regional Med. Center*, 361 Ga. App. 654, 655 (865 SE2d 259) (2021). So viewed, the evidence shows that on September 20, 2014, Ms. Conyers, who was 60 years old, was admitted to the hospital complaining of abdominal pain. Dr. Fitzsimmons diagnosed perforated appendicitis with abscess formation and scheduled surgery for the following morning. Dr. Fitzsimmons testified that he performed a pre-operative "VTE" (venous thromboembolism) or "DVT" (deep vein thrombosis) risk assessment of Ms. Conyers

3

using the Caprini Scale,[3] and that she had a Caprini score of four. The next day, Ms. Conyers underwent a diagnostic laparoscopy, an open appendectomy, and an open drainage of intra-abdominal abscess.

According to Dr. Fitzsimmons, he ordered "Heparin 5000 units sub cu pre operatively."[4] He explained that he did not know the length of Ms. Conyers' surgery — but knew that it would be complicated — and that he wanted Heparin "onboard" because "longer surgeries have higher DVT/PE risks" and because clots form usually at induction and/or maintenance of anesthesia. When asked if he ordered the Heparin one hour before surgery, Dr. Fitzsimmons explained as follows: "It is just before the operation. The computer changes that to a plus one hour or something. It is kind of goofy in the computer, but the bottom line is you order it before surgery."[5] Dr. Fitzsimmons concluded that the use of Heparin or chemical prophylaxis post-operatively was contraindicated for Ms. Conyers due to the risk of bleeding as well

---

[3] The Caprini risk assessment score is a risk assessment tool used to quantify and categorize a surgical patient's risk for venous thromboembolism (pulmonary embolism and deep vein thrombosis) and determine what level of DVT prophylaxis needs to be administered.

[4] Heparin is a chemical prophylaxis or drug that thins the blood.

[5] Ms. Conyers' surgery began at 11:58 a.m., but Dr. Fitzsimmons' order for Heparin was not entered until 11:54 a.m.

as the fact that she was unsteady on her feet; "you put somebody on Heparin, they fall, hit their head, and you have got an intracranial bleed. That can be devastating. . . . So Heparin is a double-edged sword that needs to be respected fully." Dr. Fitzsimmons learned much later that his order to give Heparin pre-operatively was never followed.

Dr. Fitzsimmons also ordered sequential compression devices ("SCDs") to be placed and functioning by the time of surgery, and to stay on through Ms. Conyers' hospitalization. He reasoned that "[f]or a moderate risk patient, SCDs, sequential compression devices, are adequate alone." Four days following her appendectomy, Ms. Conyers developed an intra-abdominal abscess on September 25, 2014, which was drained in a second procedure. Dr. Fitzsimmons testified that a patient's risk assessment can change daily and that he reevaluated Ms. Conyers daily, except for September 26, 27, and 28, when another surgeon, Dr. Patrick, covered for him. Dr. Fitzsimmons testified that "[i]t is part of [his] daily thing to look at people's feet and look at their squeezers and make sure they are on . . . . And in this case, every time that [he] visited [Ms. Conyers], [he] made no remarks saying there was anything, you know, anything different than that." He further testified that "[s]he had no signs of DVT on exam, multiple times documented throughout her hospital course[;] she never

5

had any evidence of DVT. . . . No clinical evidence of it. No swelling, no pain." According to Ms. Conyers' daughter, however, while she was staying with her mother in the hospital on September 27, 28, and 29, her mother complained that "her legs [were] hurting her. . . her calves and her feet." The daughter relayed this information to nursing staff, but could not remember which nurse. According to Dr. Fitzsimmons, Ms. Conyers was clearly getting better and was up and "ambulating in [the] hall" and preparing for "discharge planning issues."

On the morning of October 2, 2014, Ms. Conyers developed acute respiratory distress and medical staff had difficulty intubating her. She was transferred to the intensive care unit, where she coded and was unable to be resuscitated. Dr. Fitzsimmons' notes from the October 13, 2014 Discharge Summary indicate that "[n]o confirmed definitive cause of death was able to be elucidated and family refused autopsy." The death certificate indicates the immediate cause of death as cardiac arrest due to respiratory failure, and lists other significant conditions contributing to death as pneumonia, obesity, and perforated appendicitis history. While the plaintiffs' experts opine that Ms. Conyers died as a result of a pulmonary embolism, Dr. Fitzsimmons could not definitely say that a pulmonary embolism caused Ms. Conyers' death; he testified that there were "five or six things that pointed

away from pulmonary embolism," including that Ms. Conyers had elevated platelets, no hypotension, no signs of DVT on exam, and no hemoptysis (blood in the sputum).

The plaintiffs brought the underlying action for medical malpractice/wrongful death, alleging, in relevant part, that Piedmont Henry's nursing staff deviated from the standard of care by failing to appropriately evaluate Ms. Conyers' thrombosis risk following her surgery to ensure that she received necessary anticoagulants, and that this negligence proximately caused Ms. Conyers' death. Attached to the complaint were the affidavits of Dr. Michael Quinones, a general surgeon, and Judith Climenson, a certified registered nurse. Dr. Quinones averred that the care provided by the nursing staff at Piedmont Henry fell below the standard of care in multiple respects, including their failure to adequately assess Ms. Conyers' risk of thrombosis following surgery. According to Dr. Quinones, had the nursing staff not deviated from the standard of care, and had Ms. Conyers received proper and timely care from the nursing staff and Dr. Fitzsimmons, "she would have received adequate deep venous thrombosis prophylaxis and she would not have suffered the pulmonary embolism that caused her death on October 2, 2014."

Climenson averred in her affidavit that the Piedmont Henry nursing staff did not exercise the degree of care and skill employed by the nursing and medical

7

profession generally under similar surrounding circumstances and like conditions and that they breached the standard of care in multiple respects, including but not limited to failing to appropriately evaluate Ms. Conyers' thrombosis risk following surgery to ensure that she received necessary anticoagulants. In Climenson's opinion, had Ms. Conyers been properly evaluated, she would have received anticoagulants and she would not have suffered the pulmonary embolism and would not have died. In her deposition, Climenson testified that in addition to ordering SCDs, Dr. Fitzsimmons had an order in place for the nurses to assist Ms. Conyers with ambulation and to increase her activity in order to prevent DVT or VTE. According to Climenson, the record reflects that the nurses did not comply with this order. In her opinion, the nurses breached the standard of care in a number of ways, including, failing to encourage ambulation and to monitor Ms. Conyers for sign and symptoms of pulmonary embolism.

In addition to Climenson and Dr. Quinones, the plaintiffs offered testimony from numerous experts, including Dr. Joseph Caprini. According to Dr. Caprini, who developed the Caprini risk assessment score which bears his name, Ms. Conyers' score "was no less than 5 upon admission to Piedmont Henry Hospital." In his opinion, "[t]his score required the administration of [H]eparin following surgery, the

8

use of sequential compression devices, and proceeding with surgery as soon as possible to prevent the spread of infection." Dr. Caprini opined that during her hospital stay, Ms. Conyers' Caprini score was 15 prior to her fatal pulmonary embolism; a Caprini score that he described as "breathtaking" and that Ms. Conyers was a patient with an "extraordinarily high risk for venous thrombosis." In his opinion, the care provided by Piedmont Henry's nursing staff fell below the standard care in the following ways: (1) failure to give pre-operative Heparin; (2) failure to clarify Dr. Fitzsimmons' Heparin order following surgery; (3) failure to ensure proper use of SCDs; (4) failure to properly document the use of anti-embolism stocking and compression devices; and (5) failure to properly assess and report increased risk factors for DVT and advocate for administration of anti-coagulation given that Ms. Conyers was a high-risk patient and had complained of calf pain during hospitalization, a risk factor for DVT. He further opined that

> within a reasonable degree of medical probability, had Piedmont Henry Hospital and its employees complied with the standard of care required for Mrs. Conyers' condition, appropriate ongoing DVT risk assessment would have been completed in a timely manner throughout her hospitalization, physicians would have been notified of her increased risk for DVT, appropriate chemical and mechanical prophylaxis would

9

have been instituted throughout her hospitalization, and she would not have suffered a fatal pulmonary embolism.

According to Dr. Caprini, a patient's chance of experiencing a fatal event while receiving chemical prophylaxis post-operatively "is much less than 12 percent. I can show you trials where it's as low as a 10th of a percent, but let's just say much much less than 1 percent, very rare, very rare with adequate anticoagulation."

Dr. Quinones agreed with Dr. Caprini that Ms. Conyers' Caprini score upon admission was five, which required the administration of Heparin and the use of SCDs. Specifically, Dr. Quinones opined that "you could give [ ] [H]eparin 5000 subq three times a day, and sequential compression devices." According to Dr. Quinones, the care provided by the nurses fell below the standard of care in multiples respects, including their failure to adequately assess Ms. Conyers' risk of thrombosis following the surgery.

Both Drs. Quinones and Caprini agreed that a pre-operative order of Heparin was "a judgment call" or "optional" on the part of Dr. Fitzsimmons. Regardless, Dr. Quinones confirmed that the timing of the administration of Heparin was not that important pre-operatively.

Dr. Quinones further opined that the standard of care required Dr. Fitzsimmons to give both SCDs and chemical prophylaxis: "[H]eparin 5000, subq three times a day [o]r enoxaparin, 40 milligrams, subq once a day until the patient is discharged." Dr. Quinones acknowledged, however, that even if Heparin had been used, there is no guarantee that Ms. Conyers "wouldn't have still developed a clot." In his opinion, the following factors contribute to clot formation: immobility, improper use of SCDs, and failure to use Heparin.

In this case, the nursing notes confirm that the SCDs were not being used as ordered by Dr. Fitzsimmons, particularly in the last several days of the patient's life: "[There] are far more offs than on during this period of time." According to Dr. Quinones, if the SCDs had been on and working properly as ordered, "[i]t would have probably lessened the chance of a pulmonary embolism, yes. That's one of the additive components." When asked during his deposition if he could say within a reasonable degree of medical certainty that Ms. Conyers would not have had a pulmonary embolism or that it would not have been fatal if the SCDs had been on and used properly, Dr. Quinones responded as follows: "I think it would have made it less likely that she would have had a [pulmonary embolism]." Dr. Quinones further

11

confirmed that Dr. Fitzsimmons ordered SCDs , and that the nurses needed to assure that the SCDs were on and operating at all times the patient was in bed or in a chair.

Dr. Quinones also opined that Ms. Conyers' delay in coming to the hospital for treatment for her appendicitis contributed to her "ultimate outcome" and that if "[H]eparin or the enoxaparin had been used, there is no guarantee that she wouldn't have still develop[ed] a clot." Finally, Dr. Quinones opined that the combination of the chemical and the sequential prophylaxis would have made her more likely to survive than not: "I think the chemical prophylaxis [(Heparin)] would have definitely helped and made [her survival] more likely than not. The chemical prophylaxis was more important than the [SCDs]." And, when asked whether "to a reasonable degree of . . . medical probability, more likely than not, that had [Ms. Conyers] received chemical prophylaxis, her death would have been prevented," Dr. Quinones responded, "[y]es." He also confirmed again that use of the SCDs would only have lessened the chance of death; not prevented it.

In a follow-up affidavit completed four years after the affidavit filed in support of the complaint, Dr. Quinones opined that

> [t]he care provided by the nursing [staff] at Piedmont Henry Hospital
> fell below the standard of care in multiple respects, including their

12

failure to adequately assess the patient's risk of thrombosis following the surgery performed by Dr. Fitzsimmons. Mrs. Conyers' DVT risk increased during her hospitalization and she was at an extremely high risk for a fatal PE prior to her death. The standard of care required the nurses to assess Mrs. Conyers' DVT risk daily and report any increased risk for DVT to her physicians so that she could receive appropriate anticoagulants. . . . Following surgery, Mrs. Conyers remained at Piedmont Henry Hospital for the next 11 days. Mrs. Conyers[ ] suffered numerous complications, signs and symptoms that increased her DVT risk during her hospitalization and she was at an extremely high risk for a fatal PE prior to her death. Mrs. Conyers also experience[d] calf pain that should have been reported to a physician. . . . In my opinion, within a reasonable degree of medical certainty, had the nursing staff appropriately evaluated Mrs. Conyers' DVT risk throughout her hospitalization and reported the increased risks, signs and symptoms of DVT to her physicians, Mrs. Conyers would have received adequate chemical and mechanical deep venous thrombosis prophylaxis and she would not have suffered the pulmonary embolism that caused her death[.]

With regard to the SCDs, Ms. Conyers' children and friends all agreed that the devices were not always on Ms. Conyers' legs, as ordered by Dr. Fitzsimmons, or were not working. Two sons testified that "half the time" the SCDs were on their mother's legs, one was not working; if they were on and working, "[i]t was very minimal time." When this was reported to a nurse, the nurse would either try to fix

the device, or they would just turn them off "until somebody else who was an adequate person could fix them or work on them." According to Ms. Conyers' daughter, the devices were hanging off the side of her mother's bed, and the "pumps were never on her body the duration that I was there." A patient care technician who cared for Ms. Conyers the nights of September 29, 30, and October 1, and several other times before, however, testified that it was her recollection that every time Ms. Conyers "was in the bed, [the SCDs] were on." Indeed, she does not remember them not working. She never noticed Ms. Conyers having any pain in her calves or legs. When asked if she would chart such a complaint, the patient tech responded, "[a]s a tech, I wouldn't chart that, I would notify the nurse."

Defendants' expert nurse testified that nurses do not perform DVT risk assessment, and the nurses who cared for Ms. Conyers confirmed that they do not perform DVT risk assessment at Piedmont Henry; DVT risk assessments are "driven by the physicians." As for the SCDs, the nurses testified that there was an order for bilateral SCDs, and that Ms. Conyers' chart indicated that they were "on quite a bit," but that they were not on "the entire time of her hospitalization because she frequently got up and walked and walking is better than an SCD." One of the nurses recalled that in the beginning of Ms. Conyers' hospitalization, she was not getting up

14

very much but that in the end, she was getting up and ambulating in the hallway and "coming around" and improving.

Piedmont Henry moved for summary judgment, alleging that the plaintiffs could not establish that the nurses' conduct was the proximate cause of Ms. Conyers' death as Dr. Quinones — the plaintiffs' only qualified, non-rebuttal physician expert competent to offer nursing standard of care and causation testimony — admitted that even if the nurses had properly or more consistently utilized the SCDs, this may not have prevented a pulmonary embolism or Ms. Conyers' death. Piedmont Henry also alleged that summary judgment was warranted as to the plaintiffs' claim regarding the nurses' alleged failure to administer pre-operative Heparin because (1) Heparin was not required to be given by the standard of care and (2) Dr. Fitzsimmons' order could not have been followed.

After a hearing, the trial court granted summary judgment to Piedmont Henry, concluding that the plaintiffs failed to present sufficient evidence of causation as to the nurses. Specifically, the trial court concluded as follows: As to the SCDs, the testimony offered by the plaintiffs' experts did not establish a causal connection between the nursing interventions and Ms. Conyers' death; no expert testified that using the SCDs would have prevented a pulmonary embolism or death. As to the

15

nurses' failure to perform a proper deep vein thrombosis risk analysis and communicate their findings to Dr. Fitzsimmons, which prevented the administration of Heparin, the trial court found that Dr. Fitzsimmons performed his own DVT risk analysis when he saw Ms. Conyers and made the independent medical decision that Heparin was contraindicated for Ms. Conyers during her hospitalization; "[t]hus the record makes clear that even if the nurses had acted as [p]laintiffs claim they should, it would not have led to administering chemical anticoagulation, which Dr. Fitzsimmons did not believe was safe for this patient." Finally, as to Dr. Fitzsimmons' pre-operative order for Heparin, the trial court found that the plaintiffs' experts conceded that administration of pre-operative Heparin was not required by the standard of care and rested within the discretion of Dr. Fitzsimmons. Therefore, any nursing actions flowing from the order fails on the issue of causation. Additionally, the trial court found that the timing of Dr. Fitzsimmons' order made it impossible for the nurses to comply with.

In addition to the summary judgment motions, Dr. Fitzsimmons moved to exclude the testimony of Dr. Freeman, a forensic epidemiologist and the plaintiffs' rebuttal expert pursuant to OCGA § 24-7-702; Piedmont Henry joined in this motion. Dr. Fitzsimmons also moved pursuant to OCGA § 24-7-702 to exclude or limit the

16

testimonies of the plaintiffs' experts, Drs. Caprini and Hayes, alleging that they do not meet the qualification requirements needed to testify as to standard of care issues in this case, and that Dr. Caprini has attempted to interject new opinions as a rebuttal witness and his testimony is cumulative. Piedmont Henry also moved to exclude the testimonies of Drs. Caprini and Hayes on this same ground in addition to other grounds.

The trial court granted Dr. Fitzsimmons' motion to exclude the testimony of Dr. Hayes, concluding that he is not qualified to offer standard of care opinion against the defendants. The trial court also excluded the testimony of Dr. Freeman, concluding that while he may be a qualified expert in forensic epidemiology, he is not qualified to provide medical causation opinions. Finally, the trial court denied Dr. Fitzsimmons' motion to exclude Dr. Caprini, concluding that he meets the qualifications required by OCGA § 24-7-702 (c), and will be allowed to give expert testimony at trial; however, as Dr. Caprini was identified as a rebuttal expert, the trial court ruled that he is not permitted to offer new opinions on the standard of care that were not previously offered by the plaintiffs' experts, which opinions were disclosed after the deadline contained in the scheduling order. The plaintiffs appeal these rulings.

17

1. The plaintiffs allege that the trial court erred in granting summary judgment to Piedmont Henry because there is evidence that the negligence of Piedmont Henry nurses caused Ms. Conyers' death. They assert that the trial court made several erroneous findings, including that "the nurses' failure to report Ms. Conyers'[ ] DVT symptoms lacked a causal relationship to her" death. We agree.

> To establish a claim for medical malpractice, a plaintiff must prove that the defendant's negligence in the diagnosis and treatment of the plaintiff was the actual and proximate cause of the injuries he sustained. The causation element requires the plaintiff to establish to a reasonable degree of medical certainty that the injury to the plaintiff would have been avoided in the absence of the alleged medical negligence.

(Citations and punctuation omitted.) *Mekoya v. Clancy*, 360 Ga. App. 452, 462 (2) (861 SE2d 409) (2021). Causation in a medical malpractice case

> must be proven through expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson. However, Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical certainty. Moreover, causation may be established

18

by linking the testimony of several different experts and must be determined in light of the evidentiary record as a whole.

(Citation and punctuation omitted.) Id. "Questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases." (Citation and punctuation omitted.) *Moore v. Singh*, 326 Ga. App. 805, 809 (1) (755 SE2d 319) (2014).

Piedmont Henry contends that there is no evidence in this case that the alleged negligence of its nursing staff was the proximate cause of Ms. Conyers' death to any degree and that no expert has been able to link any nursing standard of care violation to the outcome in this case. According to Piedmont Henry, Dr. Fitzsimmons and the nursing staff were performing separate prophylactic interventions (chemical versus mechanical) and the nurses had no ability to control Dr. Fitzsimmons' decision not to order Heparin; "[f]ar from being a 'foreseeable' act of negligence, [the plaintiffs'] experts have testified that nurses cannot and do not perform DVT risk assessment[.]"

While there is no question that Piedmont Henry nurses are not authorized to do DVT risk assessment of patients, there is evidence in the record that Ms. Conyers complained to her daughter of leg/calf pain sometime around September 27-29. Her daughter testified that she relayed this information to a nurse, but there is no evidence

19

that the information was relayed to Dr. Fitzsimmons, who testified that Ms. Conyers "never had any evidence of DVT . . . no [lower extremity] pain." But Dr. Fitzsimmons testified that "[e]veryday is a reassessment in surgical care . . . . [a]s far as DVT risk and the required prophylaxis[.] [Y]ou have to reassess a patient at various points in their hospital course. So the risk assessment can change. So I wouldn't say standard of care is this or that. It depends on the patient's current situation." As Dr. Fitzsimmons further clarified, a patient's status and risk could be lowered or elevated; "it is a daily reevaluation of a patient."

Accordingly, it is clear from Dr. Fitzsimmons' own testimony that had he been notified that Ms. Conyers was experiencing leg/calf pain, his course of action may have changed and he may have decided to administer chemical prophylaxis in addition to the mechanical prophylaxis that he originally ordered. In fact, defendants' own nursing expert testified that she had experience with hundreds of similar patients, that approximately five of those patients had developed a DVT following this type of procedure, and that it was diagnosed "[u]sually [because] the patients would complain of pain to their legs. The nurse would assess the legs . . . . We would alert the doctor. Have what [is] known as an ultrasound done, and they would diagnose a DVT [in the calf area]." Once the DVT was diagnosed, the patient was started on a

20

Heparin drip and then discharged home on either Coumadin or Heparin injections. As defendants' own nursing expert admitted, it is a deviation from the standard of care if the nursing staff does not inform a doctor that a patient has reported calf pain.

The plaintiffs have provided expert testimony that to a reasonable degree of medical probability Ms. Conyers would not have suffered a fatal pulmonary embolism if the nursing staff had notified Dr. Fitzsimmons that Ms. Conyers had complained of calf pain toward the latter part of her hospitalization, and shortly before she suffered the pulmonary embolism. Nurse Climenson testified that the standard of care requires nurses to monitor patients for signs and symptoms of pulmonary embolism including pain in the extremities. Dr. Quinones in particular opined that Ms. Conyers experienced calf pain that should have been reported to a physician, and that in his opinion, "within a reasonable degree of medical certainty, had the nursing staff appropriately evaluated [her] DVT risk throughout her hospitalization and reported the increased risks, signs and symptoms of DVT to her physicians, [Ms.] Conyers would have received adequate chemical and mechanical deep venous thrombosis prophylaxis and she would not have suffered the pulmonary embolism that caused her death[.]" Dr. Caprini similarly opined that the nurses' failure to report Ms. Conyers' leg pain/DVT risk factor fell below the standard of

21

care, and that had the nurses properly notified physicians, appropriate chemical and mechanical prophylaxis would have been ordered for Ms. Conyers and she would not have suffered a fatal pulmonary embolism. Dr. Caprini also testified that the likelihood of a patient experiencing a fatal event while receiving chemical prophylaxis post-operatively is very rare. Based on the combined expert testimony, we conclude that the plaintiffs presented evidence creating a jury issue as to whether the nurses breached the standard of care by failing to report Ms. Conyers' leg pain to Dr. Fitzsimmons, which in turn precluded Dr. Fitzsimmons from ordering the administration of the chemical prophylaxis which could have prevented the fatal pulmonary embolism. As such, we agree with the plaintiffs that the trial court erred in granting summary judgment to Piedmont Henry. See, e.g., *Mekoya*, 360 Ga. App. at 466 (3) (affirming denial of summary judgment on plaintiffs' claim against hospital nursing staff for failing to notify doctor of patient's drop in blood pressure and failing to escalate family's request for a cardiology consult); *Evans v. Med. Center of Central Ga.*, 359 Ga. App. 797, 804 (860 SE2d 100) (2021) (reversing grant of summary judgment to hospital where nurse's breaches of standard of care caused or contributed to patient's premature discharge, leading to his death).

2. The plaintiffs contend that the trial court erred in excluding or limiting the testimony of their expert witnesses pursuant to OCGA § 24-7-702 ("Rule 702").[6] "This Court reviews a trial court's ruling admitting or excluding expert testimony only for an abuse of discretion." *Mekoya*, 360 Ga. App. at 457 (1). Under Rule 702, "it is the role of the trial court to act as a gatekeeper of expert testimony." (Citation and punctuation omitted.) *Russell v. Kantamneni*, 363 Ga. App. 899 (873 SE2d 458) (2022).

(a) The plaintiffs contend that the trial court abused its discretion in limiting the testimony of Dr. Caprini solely because he was disclosed at the case management order's deadline for rebuttal experts rather than the earlier deadline for initial experts. We agree.

The record reflects that the plaintiffs' experts were required to be designated by December 31, 2018. An amended case management order required all expert

---

[6] We note that the trial court ruled from the bench on Piedmont Henry's motion for summary judgment and excused Piedmont Henry from the remainder of the hearing. The trial court then went on to consider Dr. Fitzsimmons' motions to exclude, as discussed infra. The trial court did not consider arguments specific to Piedmont Henry. For example, as Piedmont Henry points out in its brief, the trial court did not rule on its argument that Drs. Caprini and Hayes failed to demonstrate that they supervised or taught nurses pursuant to OCGA § 24-7-702 (c) (2) (D). Therefore, our opinion only addresses the trial court's rulings on the motions to exclude expert witness testimony against Dr. Fitzsimmons and not Piedmont Henry.

opinions to be disclosed by October 22, 2019, and any rebuttal experts to be disclosed by November 18, 2019. On November 18, 2019, Dr. Caprini was identified as an expert to testify at trial on standard of care and causation. Dr. Quinones and nurse Climenson had provided affidavits in support of the complaint and, therefore, were disclosed earlier. Dr. Caprini was deposed on February 4, 2020. Dr. Fitzsimmons had been deposed on August 22, 2017. On February 21, 2020, Dr. Fitzsimmons moved to exclude the testimony of Dr. Caprini. The trial court concluded that Dr. Caprini meets the qualifications required by Rule 702, and will be allowed to give expert testimony at trial; however, as Dr. Caprini was identified as a rebuttal expert, the trial court ruled that he is not permitted to offer new opinions on the standard of care that were not previously offered by the plaintiffs' experts, which opinions were disclosed after the deadline contained in the scheduling order. Specifically, the trial court ruled that Dr. Caprini will not be permitted to offer the following opinions: (1) Dr. Fitzsimmons violated the standard of care by not taking Ms. Conyers to surgery within two hours of her presentation to the hospital; (2) Dr. Fitzsimmons violated the standard of care by not confirming whether or not his orders were followed in the "time-out" before the procedure; and (3) Dr. Fitzsimmons violated the standard of

care by not insisting upon a postmortem procedure to confirm the cause of death of Ms. Conyers.

A trial court abuses "its discretion by excluding a witness solely because the witness was identified after the deadline set in a scheduling, discovery, and/or case management order." *Lee v. Smith*, 307 Ga. 815, 823 (2) (838 SE2d 870) (2020). As we read the trial court's order, Dr. Caprini's new opinions were excluded solely because they were disclosed after the deadline set in the amended scheduling order, which is not permissible under *Lee*. Dr. Fitzsimmons contends, however, that *Dunwoody Obstetrics and Gynecology, P. C. v. Franklin*, 363 Ga. App. 90 (870 SE2d 592) (2022), and not *Lee*, controls because just as in *Franklin*, here there was a "late disclosure paired with a misleading discovery response." *Franklin* is wholly inapposite. In that case, *four* days before the start of trial and over six years after the plaintiff's deposition, the defendants served a one paragraph supplemental discovery response to an interrogatory identifying expert witnesses they expected to call at trial and a summary of their opinions. Id. at 93 (1). In that paragraph, the experts *altered* their opinions as to the standard of care and causation in the case. Id. Additionally, the ruling before us in *Franklin* was the admissibility of the plaintiff's prior abortions. Id. at 92 (1). Pretermitting the fact that Dr. Fitzsimmons moved to limit/exclude Dr.

25

Caprini's testimony pursuant to Rule 702 and OCGA § 24-4-403, and not for sanctions under OCGA § 9-11-37 like the plaintiff in *Franklin*, there is no assertion that Dr. Caprini has altered his opinion as to the standard of care or causation in this case. Moreover, the trial court's order concluded only that the plaintiffs disclosed Dr. Caprini's opinions after the deadline contained in the scheduling order; it did not conclude that the plaintiffs had made a false or deliberately misleading discovery response like the defendants in *Franklin*. Additionally, as Dr. Caprini was identified well before his deposition, Dr. Fitzsimmons had ample opportunity to question him about his standard of care and causation opinions. Based on *Lee*, we conclude that the trial court abused its discretion in limiting Dr. Caprini's testimony predicated solely on the fact that he was disclosed at the case management order's deadline for rebuttal experts rather than the earlier deadline for initial experts.

Based on *Lee*, however, we cannot simply reverse the trial court's decision as the Supreme Court of Georgia has mandated that

> when determining whether to exclude a witness who was not timely identified in compliance with a pretrial scheduling, discovery, or case management order, a trial court should consider: (1) the explanation for the failure to disclose the witness, (2) the importance of the testimony, (3) the prejudice to the opposing party if the witness is allowed to testify, and (4) whether a less harsh remedy than the exclusion of the

26

witness would be sufficient to ameliorate the prejudice and vindicate the trial court's authority

307 Ga. at 824 (3). With regard to less harsh sanctions, the Supreme Court explained that

> [i]n some cases, a continuance or out-of-time discovery may be more appropriate than imposing a sanction; or even contempt may at times be proper. Trial courts must remain mindful that only in an extreme case should the plaintiff's action be dismissed or the defendant be precluded from introducing evidence relating to his defense, because these remedies are too drastic if less harsh sanctions are appropriate.

(Citations and punctuation omitted.) Id. at 824 (3). Accordingly, we vacate the trial court's order limiting Dr. Caprini's testimony and remand the case with the direction that the court re-evaluate its ruling after considering the specific circumstances surrounding the plaintiffs' alleged failure to comply with the deadlines set out in the case management order. See *Cortes v. Georgia Power Co.*, 361 Ga. App. 103, 105 (863 SE2d 376) (2021).

(b) The plaintiffs contend that the trial court abused its discretion in granting the motion to exclude Dr. Hayes' standard-of-care opinions on the grounds that he was not qualified to testify about the standard of care for post-surgical DVT

27

prophylaxis because he is a cardiologist.[7] Specifically, the trial court found as follows:

> Dr. Hayes is a cardiologist with a subspecialty in interventional cardiology. In the past seven years, Dr. Hayes has never been asked by a general surgeon to consult on any patient with regard to his opinion about DVT prophylaxis. Dr. Hayes never trained as a surgeon, never practiced or advertised as a general surgeon, and never performed an appendectomy. In the past seven years, Dr. Hayes has never been consulted by a general surgeon regarding the use of DVT prophylaxis in the setting of any appendectomy. . . . Although Dr. Hayes demonstrated general knowledge regarding DVT prophylaxis, he failed to demonstrate specific training or experience in using DVT prophylaxis in post-surgical management of patients, which is the medical care at issue in this case.

During the hearing on the motion to exclude, Dr. Hayes testified that he is a cardiologist and was a practicing cardiologist between 2009 and 2014, and was aware of the standards of care required for post-surgical patients in performing DVT risk assessment. During that time period, he also taught at the University of Texas Medical School where he instructed medical students on risk assessment of DVT and

---

[7] Dr. Hayes also is providing causation testimony, specifically that Ms. Conyers died of a fatal "pulmonary embolus," but Dr. Fitzsimmons has not sought to exclude that portion of Dr. Hayes' opinion.

administration of Heparin and use of SCDs. He also testified that he evaluates patients "on a weekly basis as far as the risk of developing a deep vein thrombosis [and] subsequent embolis." He confirmed that he personally prescribes and administers anticoagulants to patients and makes recommendations to other physicians and also commonly sees patients in the post-operative setting: "part of that cardiovascular assessment is to ensur[e] that they are protect[ed] from deep vein thrombosis and pulmonary embolis[.]" Dr. Hayes explained that he is not asked by a general surgeon what to use for anticoagulation, but that when he assesses his own patients, he ensures that anticoagulants are "already in place" to protect a patient.

In his deposition, Dr. Hayes testified that he is an interventional cardiologist trained to do stent procedures, and that he takes care of heart attack patients "emergently." He confirmed that as an interventional cardiologist, he cares for patients who are suffering from pulmonary emboli, and that he has diagnosed pulmonary emboli dozens of times, including one or two per year during the relevant years (2009-2014). Dr. Hayes further testified that he "consult[s] on patients that are perioperative [and] post-operative all the time, and part of [his] evaluation of those patients is not only the specific question [he is] asked but the general cardiovascular risk that encompasses, are they at risk for pulmonary embolism." Dr. Hayes explained

29

that he is "well familiar . . . with anticoagulant therapy and also specifically in the setting of appendicitis . . . where perioperative bleeding is almost unheard of."

Dr. Fitzsimmons alleges that Dr. Hayes' standard-of-care opinions fails to meet the requirements of Rule 702 because he is not a surgeon, has never performed an appendectomy, and has not been in the active practice of medicine in the field in which he wishes to provide an opinion. According to Dr. Fitzsimmons, Dr. Hayes' "experience in the use of chemical anticoagulants comes from his interventional practice in the placement of stents, which inherently means his use of chemical anticoagulants is the same for *every* patient regardless of their risk factors." (Emphasis in original.) The portion of Rule 702 upon which Dr. Fitzsimmons relies in support of this argument provides that

> in [medical] malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:
>
> . . .
>
> had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

30

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in . . . diagnosing the condition[ ] or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue[.]

OCGA § 24-7-702 (c) (2) (A), (B). As we explained in *Russell*:

With regard to the requirement that the expert have "actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given," OCGA § 24-7-702 (c) (2), the Supreme Court of Georgia has explained that this language means that the plaintiff's expert does not have to have knowledge and experience in the same area of practice/specialty as the defendant doctor. Instead, under the foregoing language, the issue is whether the expert has knowledge and experience in the practice or specialty that is relevant to the acts or omissions that the plaintiff alleges constitute malpractice and caused the plaintiff's injuries. In this context, the area of specialty is dictated by the

31

allegations in the complaint, not the apparent expertise of the treating physician.

363 Ga. App. at 902, citing *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007), and *Mekoya*, 360 Ga. App. at 460 (1).

In this case, the complaint asserts that Dr. Fitzsimmons violated the standard of care by failing to give DVT prophylaxis to Ms. Conyers while she remained as a patient post-operatively in the hospital. The complaint does not allege that Dr. Fitzsimmons was negligent in his capacity as a general surgeon or in his performance of the appendectomy, but that he failed to properly assess Ms. Conyers' risk for deep vein thrombosis and treat her with anticoagulants during her hospital stay. Here, considering the scope of the allegations in the complaint and the nature of Dr. Hayes' testimony regarding his medical background and experience, we conclude that the trial court abused its discretion in granting the motion to exclude his standard-of-care opinions. Accordingly, we reverse that ruling.[8] See, e.g., *Toombs v. Acute Care*

_____

[8] The trial court seems to have ignored OCGA § 24-7-702 (c) (2) (B), quoted above, when assessing Dr. Hayes' qualification. Dr. Hayes specifically testified that from 2009 to 2014, he taught at the University of Texas Medical School where he instructed medical students on risk assessment of DVT and administration of Heparin and the use of SCDs, precisely the issues in this case. Accordingly, had we not reversed the trial court's ruling based upon OCGA § 24-7-702 (c) (2) (A), this error would mandate that we vacate this portion of the trial court's order and remand for

32

*Consultants*, 326 Ga. App. 356, 361 (756 SE2d 589) (2014) (reversing defendants' motion to disqualify expert) (physical precedent only).

(c) The plaintiffs contend that the trial court abused its discretion in excluding the causation testimony of Dr. Michael Freeman. We disagree.

During the hearing on the motion to exclude Dr. Freeman, counsel for the plaintiffs explained that Dr. Freeman is a forensic epidemiologist and that he was being called as an expert to offer two opinions: (1) to explain the signs and symptoms of a pulmonary embolism and (2) to question the reliability of the opinions as to the cause of death offered by Dr. Fitzsimmons and defendants' other experts. During the hearing, Dr. Freeman testified that he is a tenured professor of forensic medicine and epidemiology at Maastricht University in the Netherlands, and a professor of forensic psychiatry at Oregon Health Science University in Portland, Oregon. He has a "doctorate of medicine degree" from the University of Umea in Sweden,[9] and a PhD in epidemiology and a master's of public health in epidemiology from Oregon State University. He also has a master's of science in forensic medical sciences from the

a ruling on OCGA § 24-7-702 (c) (2) (B).

[9] As Dr. Freeman clarified in his deposition, "a doctor of medicine" is akin to a PhD in medicine; the degree is not designed to allow him to become a medical practitioner in a clinical setting, the degree is a research degree.

Academy of Forensic Medical Sciences in the United Kingdom and the University of Verona in Italy, and a bachelor's degree in general science from the University of Oregon. Dr. Freeman also has a four-year degree as a doctor of chiropractic. He is board certified in forensic medicine in the specific area of how epidemiological information or data is used to evaluate causation or causal relationships. He did a two-year fellowship training in forensic pathology and training in autopsy practice at the Allegheny County Medical Examiners Office in Pittsburgh and Umea Medical School in Sweden.

According to Dr. Freeman, his testimony is necessary because Ms. Conyers cannot be examined to "know exactly what it is that killed her[;] the only thing that is left is a probalistic inference which is what's most likely. So the doctors for the defendant have not given any information with regard to that. So that is where the probabilities start to become important." Dr. Freeman further explained that "the analysis that I've done is to look at people who are like Ms. Conyers in the hospital with appendicitis and look at what they died from and see how that comports with the conditions that were observed in her[.]" According to Dr. Freeman, he "understand[s] the cause of death" but is not allowed to release the data upon which he relies to anyone who has not signed a data use agreement, because his data comes from a

34

contract he maintains with the U.S. government. Dr. Freeman explained that he does not need a medical license to perform his work because he does not treat patients; he does not diagnose live patients. He is a medical scientist and "[t]he cause of death does not require a medical license . . . [and he is] legally able to provide cause of death and sign death certificates, but it's a different field. . . . It's a retrospect of analysis [which] requires an expertise, but it doesn't require a license to practice[.]"

Dr. Fitzsimmons moved to exclude Dr. Freeman's testimony pursuant to Rule 702, arguing that "he is unqualified to testify as an expert witness, his methodology is unreliable, he did not base his testimony on relevant facts or data, and [he] provides no actual opinions in this case." Dr. Fitzsimmons further argued that "[d]ue to [Dr. Freeman's] lack of any knowledge, training or experience in the clinical field of medicine, he is not qualified to provide medical opinions. However, [Dr.] Freeman attempts to present medical opinion testimony in the guise of 'epidemiologic opinions' for which he claims to be competent."

After applying the analysis set forth in Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993), the trial court excluded Dr. Freeman's testimony, ruling that while Dr. Freeman may be a qualified expert in forensic epidemiology, he is not qualified to provide medical causation

35

opinions, and that plaintiffs did not show that Dr. Freeman's methodology was reliable because he could not share the data that he used to reach his opinions.

The usual standard for the admissibility of expert testimony is found in Rule 702 (b):

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

OCGA § 24-7-702 (b). This standard is based upon Federal Rule of Evidence 702. See *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015). And, as we noted above, in determining the admissibility of expert testimony, the trial court acts as a gatekeeper, but it must act within its discretion in making this determination. See *L-3 Communications Titan Corp. v. Patrick*, 317 Ga. App. 207, 209 (1) (729 SE2d

36

505) (2012). As a gatekeeper, the trial court must assess "both the witness's qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." (Citation and punctuation omitted; emphasis omitted.) Id. "[T]he burden of establishing the reliability of the expert's opinion falls on the proponent, in this case, [plaintiffs], who [are] required to show that [their] proffered expert testimony is based upon sufficient facts or data and is the product of reliable principles and methods, which [the expert] applied reliably to the facts of the case." (Citation and punctuation omitted.) Id. at 209-210 (1).

The plaintiffs contend that *Daubert* does not require each expert to have his or her opinions co-signed by another expert and does not require every opinion to be formed through testing. Instead it asks whether the theory or technique used by the expert has been subjected to peer review and publication and that "if [Dr. Fitzsimmons] simply hired an expert with access to this publicly available database, [he] would have the same data [as] Dr. Freeman[.]"

Even assuming that Dr. Freeman is a qualified expert in forensic epidemiology — and acknowledging the plaintiffs' argument that his methodology can be challenged by Dr. Fitzsimmons on cross-examination — the parties have not cited, and we have not found, any Georgia cases addressing the admissibility of

epidemiological evidence to prove causation in a medical malpractice case. As we reiterated recently in *Chybicki*, "it is axiomatic that no expert can testify outside the limits of his area of expertise, and Georgia law considers opinions about medical diagnoses to fall outside the limits of the expertise of a non-physician." (Citation and punctuation omitted.) 361 Ga. App. at 664-665 (2). In *Freeman v. LTC Healthcare of Statesboro*, 329 Ga. App. 763 (766 SE2d 123) (2014) (physical precedent only), we "declin[ed] to adopt a 'bright line' rule that nurses may never testify to causation in medical malpractice cases, [but] nevertheless [concluded that] the evidence showed that the nurse's causation opinion in [that] case fell outside her realm of expertise." Id. at 764. See also *Chybicki*, 361 Ga. App. at 665 (2). We find similarly in this case and conclude that as an epidemiologist, Dr. Freeman's causation opinion falls outside his realm of expertise. See, e.g., *Lee v. A.C. & S. Co., Inc.*, 542 A2d 352, 355 (I), 356 (III) (Del. Super. 1987) (ruling that epidemiologist is not permitted to state his opinion concerning the probable cause of decedent's disease or death: "[a]s a general proposition, it is recognized that opinions involving diagnosis, cause and effects of disease will be confined to those who are skilled in medical science"). See also *In re Viagra Products Liability Litigation*, 658 FSupp.2d 950, 960 (B) (4) (D. Minn. 2009) (epidemiologist not qualified to render an opinion about cause of specific patient's

vision loss); *In re Fosamax Products Liability Litigation*, 645 FSupp.2d 164, 188 (III) (A) (1) (c) (ii) (S.D.N.Y. 2009) (excluding epidemiologist's testimony on general causation).

We also find persuasive an opinion by the Court of Appeals of Indiana involving expert causation testimony by Dr. Freeman. See *Tucker v. Harrison*, 973 NE2d 46 (Ind. Ct. App. 2012). In that case, the plaintiff filed a medical malpractice action against her doctor, alleging that he negligently performed a surgical procedure which damaged her ovaries and left her infertile. Id. at 47. The plaintiff sought to tender as evidence the videotape deposition of Dr. Freeman regarding the statistical probability that the surgery caused the plaintiff's injuries. Id. at 48. The trial court excluded the probability evidence. Id. The plaintiff appealed, contending that the trial court erred in excluding Dr. Freeman's probability testimony about causation. Id. at 50 (I) (B). The appeals court rejected the plaintiff's argument that epidemiological testimony has been accepted in litigation all across the country, noting that none of the cases cited by the plaintiff were medical malpractice cases, and that "'epidemiological studies do not provide direct evidence that a *particular plaintiff* was injured by exposure to a substance.'" (Citation omitted; emphasis supplied.) Id. at 51 (I) (B). "The question here, however, is not whether this type of surgery is

associated with an increase in ovarian failure; the question is whether [the defendant]'s negligence in performing the surgery caused [the plaintiff]'s ovarian failure." Id. The appeals court affirmed the trial court, ruling that while Dr. Freeman may be qualified to offer expert epidemiological opinion testimony, his epidemiological testimony is not relevant to the issue of causation in this medical malpractice case. As the appeals court explained in that case:

> Dr. Freeman is not a medical doctor. He may be qualified to offer a mathematical opinion, *but he was not shown to be qualified to offer a medical opinion as to causation*. [The plaintiff] is required to show that [the defendant] was the proximate cause of her injuries. Testimony establishing that the fact of a surgery makes ovarian failure more likely could mean that [the defendant] did everything right and ovarian failure is simply a risk of having any sort of ovarian surgery. It does not establish a causal relationship between [the defendant]'s acts or omissions and [the plaintiff's] injury. Although probability testimony may be appropriate in certain circumstances, here, allowing Dr. Freeman to testify it was ninety-nine percent more likely that the surgery caused ovarian failure than that it was coincidence is not relevant to nor would it assist the jury in making the determination of whether [the defendant's] performance of the bilateral cystectomy caused [the plaintiff's] ovarian failure, and it runs the substantial risk of misleading the jury.

(Punctuation omitted; emphasis supplied.) Id. at 52 (I) (B). The trial court in this case similarly did not abuse its discretion in excluding the medical causation opinion testimony of Dr. Freeman.

*Judgment affirmed in part, reversed in part, and vacated in part, and case remanded with direction. Barnes, P. J., and Hodges, J., concur.*